**Ivonne PADILLA, Appellant,**

v.

**Peter MASON and Jaeson Jones, Appellees.**

No. 08–03–00123–CV.

Court of Appeals of Texas, El Paso.

July 28, 2005.

Gina Palafox, El Paso, for appellant.

Seth Byron Dennis, Asst. Atty. Gen., Austin, for appellees.

Before Panel No. 4, BARAJAS, C.J., and McCLURE, J.

## *OPINION*

ANN CRAWFORD McCLURE, Justice.

This case involves Ivonne Padilla's claim that two Texas Department of Public Safety troopers, Peter Mason and Jaeson Jones, used excessive force against her during a traffic stop, resulting in personal injuries. Padilla brought suit against Mason and Jones asserting both federal and state law claims. The trial court granted summary judgment in favor of Mason and Jones on their affirmative defenses of qualified immunity and official immunity. We affirm.

### AFFIRMATIVE DEFENSES

In her first two issues, Padilla contends that Mason and Jones failed to establish that there is no genuine issue of material

fact as to one or more essential elements of the affirmative defenses of qualified immunity and official immunity.

### Standard of Review

The issue on appeal is whether Mason and Jones, as the movants, met their summary judgment burden by establishing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *See* TEX.R.CIV.P. 166a(c); *Cate v. Dover Corp.*, 790 S.W.2d 559, 562 (Tex.1990); *Wallace v. Moberly*, 947 S.W.2d 273, 275 (Tex.App.-Fort Worth 1997, no writ). We will resolve all doubts about the existence of a genuine issue of material fact in favor of the non-movant, Padilla. *Wallace*, 947 S.W.2d at 275, *citing Cate*, 790 S.W.2d at 562. Therefore, we must view the evidence and its reasonable inferences in the light most favorable to her. *Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company*, 391 S.W.2d 41, 47 (Tex. 1965); *Wallace*, 947 S.W.2d at 275. In deciding whether there is a material fact issue precluding summary judgment, we will disregard conflicts in the evidence and accept evidence favorable to Padilla as true. *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Wallace*, 947 S.W.2d at 275. We will not consider evidence that favors the position of Mason and Jones unless it is uncontroverted. *Great Am.*, 391 S.W.2d at 47; *Wallace*, 947 S.W.2d at 275.

### Facts

Padilla is a United States Border Patrol agent. On the evening of November 17, 2000, Padilla and her fiancé, Rafael Ramirez, who is also a Border Patrol agent, went to a nightclub in El Paso. Ramirez drank three beers and Padilla drank two. They left the club and drove to Horizon City to find a friend, but they were unsuc-cessful and returned to El Paso. At around 2 a.m., DPS Trooper Peter Mason pulled the car over for speeding. At Mason's request, Ramirez exited the vehicle and stood outside of his car. When Ramirez produced his driver's license, Mason saw his Border Patrol badge. Ramirez told Mason that both he and Padilla were Border Patrol agents and that he had been drinking that evening. Mason noted that the vehicle had no front license plate, and that both the registration and inspection stickers had expired. Mason noticed that Ramirez appeared tired and asked whether someone else could drive the car. Ramirez replied that Padilla could drive. When Mason learned that Padilla had also been drinking that evening, he decided to ascertain whether she was capable of driving. He did not tell either Ramirez or Padilla that this was his intention.

Mason approached the passenger side of the vehicle, opened the door, and asked Padilla whether she could drive the car. Padilla had heard none of the exchange between Mason and Ramirez, as they had been standing outside of the car and she had remained inside. Mason, who had seen empty beer bottles in the car when Padilla exited, asked Padilla whether she had been drinking, and she replied that she had. Mason told her that he wanted to perform a field sobriety test but he did not explain why. Padilla became upset and argumentative because she did not understand why he was doing the field sobriety test when she had not been driving the car. Mason explained the instructions for the horizontal gaze nystagmus test (HGN). He became frustrated with Padilla because she did not follow his instructions. Rather than following his finger with just her eyes, Padilla moved her entire head. In an angry, condescending tone, Mason told Padilla not to move her head, but she still did not follow his instructions. Because of Mason's demeanor

and tone of voice, Padilla felt fearful and uneasy, and she did not understand why he was treating her that way.

Due to Padilla's demeanor, Mason asked whether she had her service weapon with her.[1] When Padilla hesitated, Mason feared for his safety and decided to conduct a pat-down search. Mason placed his flashlight on the hood of the car and asked Padilla to turn around toward the vehicle so that he could perform a pat-down. In his deposition and summary judgment affidavit, Mason explained that as he reached for Padilla's left elbow with his left hand in order to guide her around, she quickly pulled away and brought her arm up toward his neck and head, stating "You will not arrest me." Mason quickly turned Padilla around and attempted to secure her arms. He secured her left arm and placed it in an arm bar but Padilla continued to push back against him in what appeared to be an attempt to free herself. Mason pulled Padilla's left wrist and arm behind her back and pushed her wrist up her back in an effort to stop her from struggling. During the struggle, Mason heard a "pop," and he told Jones, who arrived on the scene shortly before the struggle,[2] that he thought he had broken Padilla's arm. He was quite correct, as Padilla suffered a spiral oblique fracture of her humerus bone which required surgical repair and insertion of a metal plate.

Padilla had a different view of the events which led to her injury. Mason did not ask her about her duty weapon when he asked her to turn around nor did he tell her that he was going to do a pat-down. When Mason asked Padilla to turn around, she asked him why he was arresting her because she knew she had not violated the law. Padilla recalled that Mason asked her to turn around after he was already physically turning her, and "it happened very fast and all of a sudden he's, like, on top of me, practically." Mason grabbed Padilla's arms and turned her around, and she felt pain in her left arm when he pulled it behind her back. Although she repeatedly told Mason that he was hurting her arm, he would not stop. Padilla's next memory was that she slumped to the ground in pain, and was pulled to her feet and handcuffed.

The record includes a videotape of the encounter. Mason and Jones rely heavily on this videotape to support their contention that Padilla resisted Mason's attempt to perform a pat-down, leading to her restraint and injury. Due to officer error, there is no audio during Mason's approach, the attempted sobriety test, or the struggle between Mason and Padilla. The video shows Mason and Padilla facing each other beside the passenger door, with Mason shining his flashlight in Padilla's face, presumably in an attempt to perform the HGN test. Padilla can be seen motioning with open hands just below her waist. Mason reached behind Padilla, slowly set his flashlight on the car, and attempted to turn her around. As he touched Padilla's arms, she suddenly jerked away and one of her arms flailed towards Mason's upper body and face. Mason grabbed her arms, twisted her around, and shoved her into the side of the car three times. With each impact, the two moved closer to the rear of the car, until Padilla slumped to her knees. Her left arm hung limply at her side from

1. Padilla disputed that Mason asked her about her duty weapon at this point in the stop. She recalled that he did not ask her about her weapon "until the very end of the stop; not the beginning, when I spoke to him...." Padilla did not have her weapon with her.

2. Jones drove by the scene at 2:14 a.m. and saw that Mason had two subjects out of the vehicle and separated. Consequently, he drove up to see if Mason needed assistance.

this time forward. The physical confrontation between Padilla and Mason lasted approximately nine seconds. Jones then appeared in the video and momentarily grasped Padilla by her left arm. The troopers then handcuff Padilla's good arm to her jeans and Mason conducted a pat-down search.

Audio is first heard on the tape after Mason returned to his patrol car. Mason requested that EMS be dispatched because he thought a "subject's arm is broken." Padilla, concerned that she would get in trouble with her employer, told the troopers that she just wanted to go home. Mason explained that he only wanted to determine whether she could drive the vehicle and states, ". . . you started freaking out on me." Ramirez, who was standing nearby, reiterated, ". . . babe, and you freaked out."

In a separate discussion, Mason told Jones twice that he thought he broke Padilla's arm and Jones advised him to not say anything. Jones mentioned that both Ramirez and Padilla had been stopped before for speeding, and cautioned Mason, "you need to cover yourself." Jones also advised Mason that he needed to call a supervisor. But rather than calling a DPS supervisor, Mason called a Border Patrol supervisor.[3]

While the troopers waited for the supervisor, EMS arrived and evaluated Padilla. Mason told the EMS attendant that he placed Padilla under arrest and twisted her arm behind her because she struggled with him. Padilla immediately disputed Mason's statement that she had struggled. The EMS attendant was unsure whether Padilla's arm was broken or dislocated and

recommended that it be x-rayed. Padilla refused to be transported by EMS to the hospital.

While EMS attended to Padilla, Mason asked Ramirez whether there were any weapons in the car. Ramirez replied that there were none and Mason seemed satisfied with Ramirez's answer. When Jones asked Mason what happened, he gave his version of events:

> When I told her to put her—hold her hands like this, she goes, you know, you're trying to make me look stupid. . . . I said, ma'am, I'm trying to get your head to stop moving. Every time I say, watch my finger, you move your whole head. . . . She wouldn't do it. She just—and then I said, ma'am, turn around. Turn around. So she started getting loud and boisterous. And I was like, at this point, you know, federal agent or not, you—fuck that. You know, I don't know if you've got your gun on you or not, but I said, ma'am, turn around. And when I grabbed her hand—you're arresting me? And just started—you know, I'm like, ah shit. And then I grabbed her. And then when I grabbed her, wham, pop, and I held her right there.

When the Border Patrol supervisor, Captain Ron LeBlanc, arrived, Mason gave the following explanation about what had happened:

> [Mason]: Pulled them over for speeding.
> [Captain LeBlanc]: Okay.
> [Mason]: 70 in a 55. Get them out, talk to them a little bit, find out he's a little bit intoxicated.[4]
> [Captain LeBlanc]: All right.

---

**3.** DPS regulations required Mason to immediately notify his supervisor regarding a traffic stop involving another law enforcement agency. Mason was subsequently reprimanded for violating this regulation.

**4.** Mason subsequently gave a sworn statement to his supervisor that he did not believe Ramirez was intoxicated, only tired. He stated the same conclusion during his deposition.

[Mason]: Then I—and so that I don't have him drive, I want to see if she can drive the car.

[Captain LeBlanc]: Uh-huh.

[Mason]: And I go to talk to her, she don't want to follow any instructions I give her. And then when I told her to hold her head straight, she got pissed.

[Captain LeBlanc]: Is he armed? Is he carrying a gun?

[Mason]: No, neither one of them are armed.

[Captain LeBlanc]: Did you pat them down?

[Mason]: No, I didn't pat them down.[5]

. . .

[Captain LeBlanc]: Are both of them agents?

[Mason]: Yes.

[Captain LeBlanc]: They're both agents?

[Mason]: Yep. She tended to get—she just went ballistic and started getting upset and loud. And I said, Ma'am, if you don't calm down, you know, I'm going to have to place you in handcuffs. She didn't want to do it, so I end up—said, Okay. So I grabbed her by her hand. As I turned her around, she said, You ain't—you ain't arresting me. And she turned around and started trying to fight, and then that's when I threw her over the car, and I think that I may have—I don't know—broke her arm or popped it out of socket or something, but we called EMS. They were already out here. They checked her for her arm, put her in a sling. She refused to go with them—

[Captain LeBlanc]: Okay.

Mason and Jones released Ramirez and Padilla to Captain LeBlanc and left the scene. Mason notified his supervisor about the incident after returning to the DPS office with the videotape, approximately thirty minutes after he left the scene. Mason intended to file resisting arrest and public intoxication charges against Padilla, but his superiors decided not to file any charges against Ramirez or Padilla and ordered Mason not to do so.

### Qualified Immunity—Federal Claims

Padilla sued Mason and Jones in their individual capacities for excessive force and false arrest pursuant to 42 U.S.C. § 1983. She alleged that they used unreasonable force in violation of her right to be free from unreasonable seizures under the Fourth Amendment and that they subjected her to an unreasonable restraint of her person without due process in violation of her rights under the Fifth Amendment. In response to these federal claims, Mason and Jones moved for summary judgment on the ground of qualified immunity.

Qualified immunity is an immunity from suit available to government officials sued in their individual capacities under section 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Scott v. Britton*, 16 S.W.3d 173, 180 (Tex.App.-Houston [1st Dist.] 2000, no pet.). Government officials performing discretionary functions have qualified immunity from a suit for damages so long as the official's conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have been aware. *See Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999); *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

---

**5.** This is another example of the shifting explanations Mason offered concerning his conduct.

Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Whether an official can be held personally liable for taking an allegedly unlawful action turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Qualified immunity shields an officer if a reasonable officer could have believed the action to be lawful in light of clearly established law and the information the officer possessed. *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040.

 In conducting a qualified immunity analysis, we engage in a two-part test: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (2) whether the official's conduct was objectively reasonable at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Wilson*, 526 U.S. at 609, 119 S.Ct. at 1697. The threshold question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. If the facts do not show a constitutional violation, the official is entitled to immunity. *Id.* If, on the other hand, violation of a constitutional right is shown by the facts

alleged, the next step is to determine whether that right was clearly established at the time of the alleged violation. *Id.*

 In her amended petition, Padilla alleged that Mason, without provocation, shoved her into the side of the vehicle, twisted her arm behind her and continued to apply force while knowing that he had injured her arm.[6] With respect to Jones, she alleged only that he kept her handcuffed during the duration of the traffic stop. Padilla alleged that the force used by Mason and Jones was unreasonable under the circumstances and violated her Fourth Amendment right to be free from of an unreasonable seizure.[7] The use of force violates the Fourth Amendment if it is excessive under objective standards of reasonableness. *Saucier*, 533 U.S. at 201–02, 121 S.Ct. at 2156; *see Graham*, 490 U.S. at 395, 109 S.Ct. at 1871. But the analysis does not end there, because we must still consider whether the right allegedly violated was clearly established in a more particularized sense. *See Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156; *see Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3039. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* Placing the issue in the context of this case, the relevant inquiry is whether it would be clear to a reason-

---

6. Padilla's petition did not allege that Jones used force.

7. The petition additionally alleged that she was deprived of her liberty without due process in violation of the Fifth Amendment. A claim that law enforcement officials have used excessive force in the course of an ar-

rest, investigatory stop, or other "seizure" of a free citizen is properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under the substantive due process approach. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).

able officer that it was unlawful to use force against Padilla under the circumstances.

 Three legal concepts come into play in this case: probable cause, temporary detention based on reasonable suspicion, and pat-down search. An officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge, and of which he has reasonable trustworthy information, are sufficient to warrant a person of reasonable caution to believe that a particular person has committed or is committing an offense. *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975); *Amores v. State,* 816 S.W.2d 407, 413 (Tex.Crim.App. 1991). An officer is generally justified in briefly detaining an individual on less than probable cause for the purposes of investigating possibly-criminal behavior where the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Further, a state official who detains a person briefly for investigation may conduct a limited pat-down search of that person if the official has a reasonable belief that the person detained poses a threat to the official's safety or the safety of others. *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The same standards will apply whether the person detained is a pedestrian or is the occupant of an automobile. *See Shaffer v. State,* 562 S.W.2d 853, 855 (Tex.Crim.App.1978). We also must bear in mind that the right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at

396, 109 S.Ct. at 1872. During a temporary detention, officers may use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Rhodes v. State,* 945 S.W.2d 115, 117 (Tex. Crim.App.1997).

 The uncontroverted summary judgment evidence established that probable cause existed to stop Ramirez for speeding. During the course of his brief investigation, Mason learned that Ramirez, who appeared noticeably tired, had been drinking. Ramirez also told Mason that Padilla had been drinking. Although Ramirez did not exhibit any signs of intoxication, he admitted to Mason that he was tired. At this point, Mason became concerned about Ramirez's ability to safely operate the vehicle and he decided to ascertain whether Padilla was capable of driving. When Padilla exited the vehicle, Mason saw empty beer bottles in the passenger side floorboard and Padilla had the odor of alcohol on her breath and exhibited other signs of intoxication. Padilla did not follow Mason's instructions for the field sobriety test and became increasingly upset and argumentative. According to Jones, Padilla was yelling at Mason in an aggressive manner when Jones arrived on the scene. At this point, a reasonable peace officer had reasonable suspicion to investigate whether Padilla had committed public intoxication.[8]

The evidence is conflicting whether Mason then asked Padilla if she had her weapon with her. But given Padilla's aggressive demeanor and the possibility that she had her weapon with her, a reasonable peace officer could have concluded that conducting a *Terry* pat-down search for

---

8. A person commits an offense if the person appears in a public place while intoxicated to the degree that the person may endanger the

person or another. Tex.Penal Code Ann. § 49.02 (Vernon 2003).

weapons was both necessary and appropriate. A reasonable officer could have also believed that the circumstances permitted the handcuffing of Padilla during the remainder of the investigative detention in order to maintain the status quo and ensure his safety. When Mason touched Padilla's elbow in an effort to turn or guide her around to face the vehicle, she pulled her arm away, nearly striking Mason in the upper body, and stated, "You will not arrest me." At that point, a reasonable law enforcement officer would have believed that he had probable cause to arrest Padilla for resisting arrest[9] and was authorized to use force to secure the arrest.[10]

Jones did not appear on the video until after the injury had occurred. While he initially grasped Padilla by the injured arm to lift her from her knees into a standing position, he let go after a couple of seconds and did not touch the arm again. There was no evidence that Jones knew Padilla's arm was broken at the time he attempted to lift her to a standing position. In fact, the summary judgment evidence established that Jones did not know until later that Padilla's arm had been injured. Under these facts, a reasonable officer could have believed that it was appropriate to lift Padilla to her feet. The summary judgment evidence also established that Jones maintained the handcuff on Padilla's uninjured arm for the duration of the roadside detention. A reasonable peace officer could have believed that it was proper to handcuff Padilla either because probable cause existed to arrest her for resisting

arrest or to ensure the officer's safety and maintain the status quo during the remainder of the detention.

Because there was no clearly established rule which would prohibit Mason from using the force that he did, he is entitled to qualified immunity. Likewise, there was no clearly established rule that would prohibit Jones from briefly grasping Padilla's injured arm before he knew it was injured or from maintaining a handcuff on Padilla's uninjured arm during the continuing investigation. The trial court did not err in granting summary judgment in favor of both troopers on the ground of qualified immunity. Issue One is overruled.

### Official Immunity—State Claims

Padilla sued Mason and Jones for false arrest, defamation, intentional infliction of emotional distress, and assault and battery. The troopers asserted official immunity as an affirmative defense to these state law claims.

■■■■■■ Official immunity is an affirmative defense that shields governmental employees from personal liability so that they are encouraged to vigorously perform their official duties. *Telthorster v. Tennell*, 92 S.W.3d 457, 460–61 (Tex.2002). It is designed to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light. *Id.* at 463. Official immunity is particularly appropriate and necessary in police work, where officers must be free to make split-second judgments based on their ex-

---

**9.** A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer from effecting an arrest, search, or transportation of the actor by using force against the peace officer. Tex.Penal Code Ann. § 38.03(a)(Vernon 2003). It is no defense to prosecution under Section 38.03 that the arrest or search was unlawful. Tex.Penal Code Ann. § 38.03(b)(Vernon 2003).

**10.** In making an arrest, all reasonable means are permitted to be used to effect it. No greater force, however, shall be resorted to than is necessary to secure the arrest and detention of the accused. Tex.Code Crim.Proc. Ann. art. 15.24 (Vernon 2005).

perience and training, without fear of personal liability. *Id.* A governmental employee is entitled to official immunity for (1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that the employee acts in good faith. *Id.* at 461. To obtain summary judgment on the basis of official immunity, a governmental employee must conclusively establish each of these elements. *Id.*

In *Telthorster,* the Texas Supreme Court enunciated the good-faith standard to be applied when a police officer is sued for injuries inflicted during an arrest. *Id.* at 459. Noting that its approach to good faith has been shaped by "a desire to avoid overdeterrence of energetic law enforcement," the court considered the balance to be struck between the competing interests of unflinching law enforcement and the right of citizens to recover for injuries caused by unreasonable conduct. *Id.* at 463–64. The court found that the inherent risks to the general public previously considered in cases involving high-speed chases are not implicated in cases involving injuries during an arrest. *Id.* at 464. Official immunity's underlying purpose to encourage energetic law enforcement is most salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. *Id.* During arrest situations, officers routinely are forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id.* Arresting officers often confront at close range suspects whose violent intentions and capabilities may not be readily apparent. *Id.* A high risk of liability would likely compel arresting officers to act hesitantly when immediate action is required, subjecting themselves and the public to unnecessary risks. *Id.* Based on these policy considerations, the court held that when an officer is

engaged in an arrest that results in injury to the suspect, a particularized need/risk assessment is not compelled in light of official immunity's overriding purpose to reduce the threat that civil liability may deter arresting officers from acting with the decisiveness and judgment required by the public good. *Id.*

▆▆▆ In cases such as this one, the officer asserting official immunity must still prove good faith but without the need/risk assessment designed to protect the general public. *Id.* at 465; *City of Lancaster v. Chambers,* 883 S.W.2d 650, 656–57 (Tex.1994). The court formulated the following good faith test: the defendant must show that a reasonably prudent officer, under the same or similar circumstances, could have believed that his or her conduct was justified based on the information he possessed when the conduct occurred. *Telthorster,* 92 S.W.3d at 465. The defendant need not prove that it would have been unreasonable not to engage in the conduct, or that all reasonably prudent officers would have engaged in the same conduct. *Id.* Rather, he must prove only that a reasonably prudent officer, under similar circumstances, *might* have reached the same decision. *Id.* That the defendant was negligent will not defeat good faith; this test does not inquire into "what a reasonable person *would have done,*" but into what a "reasonable officer *could have believed.*" *Id.*

▆▆▆ Once the officer meets that burden, the plaintiff must do more than show that a reasonably prudent officer could have reached a different decision. *Id.* Instead, the plaintiff must offer evidence that no reasonable officer in that position could have believed that the facts justified the conduct. *Id.* If officers of reasonable competence could disagree on

this issue, the officer acted in good faith as a matter of law. *Id.*

Padilla does not dispute that Mason and Jones were performing discretionary duties within the scope of each trooper's employment. Therefore, the only issue is whether the troopers conclusively established the good faith element.

### Trooper Mason's Good Faith Evidence

 Mason's summary judgment evidence included the affidavit of Albert Rodriguez, Commander of the Training Academy for the Texas Department of Public Safety. Rodriguez reviewed the videotape, in slow motion and frame-by-frame; Padilla's original complaint; the oral depositions of Padilla, Ramirez, Mason, Jones, and Thomas Mandarino (Mason's supervisor); and DPS Internal Affair's investigation of the incident. Rodriguez concluded:

(1) the initial stop for speeding was based on probable cause;

(2) Mason acted reasonably in asking whether the passenger could drive given Ramirez's statements that he had been drinking and was tired;

(3) any reasonable law enforcement officer could have believed that Padilla might also be too tired to drive or intoxicated;

(4) reasonable suspicion existed to investigate whether Padilla was intoxicated;

(5) given that Padilla exhibited signs of intoxication, she became agitated and uncooperative, and Mason knew Padilla was a Border Patrol agent, any reasonable law enforcement officer could have believed that Padilla was armed with an off-duty weapon;

(6) under these circumstances, any reasonable law enforcement officer could have believed that it was necessary to conduct a "pat-down" search to ensure the officer's safety;

(7) the frame-by-frame view of the incident shows that Padilla physically resisted Mason's attempt to turn her around;

(8) probable cause existed to arrest Padilla for resisting the pat-down search pursuant to Section 38.03 of the Penal Code;

(9) Mason brought Padilla's left arm behind her back, a technique known as "joint manipulation," to gain control of Padilla and handcuff her;

(10) the joint manipulation technique is a type of "weaponless control" and is the lowest level of physical force as outlined in TCLEOSE's use of force continuum;

(11) Mason's use of force was justified, necessary, and legal under Section 9.51 of the Penal Code;

(12) any reasonable and prudent law enforcement officer could have taken the same or similar actions when presented with the same or similar circumstances; and

(13) Mason's actions were objectively reasonable, discretionary, within the course and scope of his authority and conducted in good faith.

The summary judgment evidence, including Rodriguez's affidavit, conclusively demonstrates that a reasonably prudent officer *could* have believed that it was necessary to conduct a pat-down search, and a reasonably prudent officer might have decided to use force to gain physical control of Padilla and handcuff her after she resisted the officer's attempt to search her.

### Trooper Jones' Good Faith Evidence

 Padilla did not assert in her petition that Jones used force against her. Instead, she complained that he maintained a handcuff on her uninjured arm

during the remainder of the detention. Rodriguez concluded that there was no objective evidence to indicate that Jones used force or falsely arrested Padilla. Given that probable cause existed to arrest Padilla for resisting arrest and she continued to struggle against Jones even while handcuffed, a reasonably prudent officer could have believed that maintaining physical custody of Padilla was appropriate.

### Padilla's Evidence

 In response, Padilla offered an expert witness affidavit by Harry Kirk, who holds an instructor's license from TCLEOSE and has twenty-seven years of law enforcement experience. Based on his review of the videotape, Kirk concluded that Padilla did not pose a threat to the safety of the officers to justify their use of a degree of force sufficient to cause a broken arm or to exacerbate her injury. The affidavit additionally stated that "no objectively reasonable officer under the same or similar circumstances would have continuously applied the level of force as was used against Ivonne Padilla under the circumstances depicted...." But the affidavit fails to satisfy *Telthorster* because it does not establish that no reasonable officer could have believed, under the circumstances, that Padilla posed a potential threat, that it was necessary to conduct a pat-down search, and that Padilla's resistance to the search justified the use of force. It does not establish that the circumstances were such that no reasonable officer could have believed that the defendants' conduct was justified. At best, Kirk's affidavit shows only that reasonably competent officers could disagree as to whether the use of force was objectively reasonable.

The facts here demonstrate the tension between protecting the rights of a citizen and protecting public officials from private liability for zealously performing their official duties. We are troubled by the missing audio, by Jones' warnings that Mason "cover himself," and by Mason's inconsistent stories. We have noticed the not-so-veiled reference to turf struggles between various law enforcement agencies and Mason's decision to summon Padilla's supervisor rather than his own. And we are frankly appalled at Padilla's uncontroverted testimony that one of the troopers told her that she "deserved" the broken arm. That being said, we must conclude that Padilla's summary judgment evidence falls short of *Telthorster's* requirements. For the foregoing reasons, Issue Two is overruled.[11] We affirm the judgment of the trial court.

---

11. In Issue Three, Padilla asserts that Mason and Jones failed to disprove at least one essential element of each of her causes of action. Given our resolution of Issues One and Two, it is unnecessary to address the third issue.