**Opinion issued April 6, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00327-CV

————————————

**CITY OF HOUSTON, Appellant**

**V.**

**FRANK NICOLAI AND DEBORA NICOLAI, AS PARENTS OF CAROLINE NICOLAI, DECEASED, Appellees**

———

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-75121**

———

**OPINION DISSENTING FROM THE GRANTING OF EN BANC RECONSIDERATION**

In this interlocutory appeal,[1] appellant, City of Houston (the "City"),

challenges the trial court's order denying its summary-judgment motion filed in the

---

[1]   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5).

suit of appellees, Frank Nicolai and Debora Nicolai, as parents of Caroline Nicolai, deceased (collectively, the "Nicolais"), against the City for negligence and wrongful death. In its sole issue, the City contends that the trial court lacks subject-matter jurisdiction over the Nicolais' suit.

Here, because the en banc majority merely disagrees with the panel majority's original holding and incorrectly concludes that the City did not establish its entitlement to governmental immunity, I respectfully dissent from the granting of en banc reconsideration and from the en banc majority's analysis of the merits.[2]

## Background[3]

In their ninth amended petition, the Nicolais alleged that at about 3:30 a.m. on October 2, 2013, Houston Police Department ("HPD") Officer R. Gonzales

---

[2] *See* TEX. R. APP. P. 41.2(c) ("En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration."); *see also In re Marriage of Harrison*, 507 S.W.3d 259, 261 (Tex. App.—Houston [14th Dist.] 2016, order) (Frost, C.J., dissenting to granting of en banc reconsideration) ("[T]he Supreme Court of Texas has made a policy decision to disfavor en banc reconsideration, and instead to reserve the special procedure for rare cases meeting one or both of the two en banc criteria." (internal footnotes omitted)); *Thompson v. State*, 89 S.W.3d 843, 856 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (Jennings, J., concurring in denial of en banc reconsideration) ("The standard for en banc consideration is not whether a majority of the en banc court may disagree with all or a part of a panel opinion. Neither is an assertion that an issue is 'important' sufficient [to justify en banc reconsideration].").

[3] This is the second appeal that the Court has heard in this case. *See City of Houston v. Nicolai*, 539 S.W.3d 378 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (affirming trial court's denial of City's plea to jurisdiction where evidence raised fact issue as to whether City's governmental immunity was waived under Texas

handcuffed the decedent, Caroline, and placed her in the back seat of a patrol car. Gonzales failed to buckle the decedent's seat belt. While Gonzales was transporting the decedent in the patrol car, another car driven by Nicole Moser struck the patrol car at the intersection of Chartres Street and Texas Avenue in downtown Houston, Texas. Moser was intoxicated and drove through a red traffic light on Texas Avenue. The collision caused the decedent to be ejected from the patrol car, and she sustained severe injuries that ultimately resulted in her death.

According to the Nicolais, at the time of the collision, Officer Gonzales was acting in the course and scope of her employment with the City and operating a motor-driven vehicle owned by the City. The Nicolais brought claims against the City for negligence and wrongful death. The Nicolais alleged that Gonzales was negligent in:

- "[F]ailing to use, misusing or improperly using the seat belt on [the decedent] in [t]he [patrol car,] allowing [the decedent] to be ejected upon impact";

- "[F]ailing to keep such a lookout as a person of ordinary, reasonable prudence would have kept under the same or similar circumstances";

- "[F]ailing to slow down or speed up in order to avoid the collision";

- "[F]ailing to timely and properly apply the brakes or accelerate to avoid the [collision]";

Tort Claims Act ("TTCA") for Nicolais' claims arising from governmental employee's operation or use of motor-driven vehicle).

3

- "[F]ailing to take appropriate evasive action or turn [the patrol car] and/or slow down to avoid the collision or lessen the impact";

- "[H]andcuffing [the decedent] in the back[]seat, when [she] did not appear to be under arrest or need to be handcuffed";

- "[I]mproperly or negligently providing police protection as required by a municipality under the Texas Civil Practice [and] Remedies Code and/or the [Texas] Government Code"; and

- "[F]ailing to follow policies and procedures regarding use of seat[]belts."

The Nicolais alleged that Gonzales's negligence proximately caused the decedent's death, and the City was vicariously liable for Gonzales's negligence.

The City answered, generally denying the allegations in the Nicolais' petition, and asserting governmental immunity and official immunity as affirmative defenses.

The City then moved for summary judgment, arguing that it was entitled to judgment as a matter of law because the trial court lacks subject-matter jurisdiction over the Nicolais' suit. The City asserted that it was protected from liability by governmental immunity, and the Texas Tort Claims Act ("TTCA")[4] does not waive the City's governmental immunity in a suit arising from the negligent operation or use of a motor-driven vehicle by a governmental employee acting within the scope of her employment when the employee is not personally liable to the plaintiffs under

---

[4] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109.

4

Texas law.[5] Relevant to this case, a governmental employee is not personally liable to the plaintiffs if she is protected by official immunity. According to the City, Officer Gonzales is protected from liability by official immunity because she was acting within the scope of her authority, performing a discretionary duty, and acting in good faith when the collision occurred. As to performance of a discretionary duty, the City asserted that Gonzales was performing a discretionary duty at the time of the collision by transporting the decedent, a person whom she believed was intoxicated, to the sobering center in downtown Houston, instead of to jail. The City attached to its summary-judgment motion, among other things, the depositions of Gonzales, the Nicolais' expert witness Lee Ann Grossberg, M.D., HPD Detective C. Sartor, the Nicolais' expert witness Richard V. Baratta, Ph. D, HPD Sergeant I. Izaguirre, the Nicolais' expert witness Lou Reiter, HPD Officer T. Cox, and HPD Officer A. Hart-Joseph.

In their response to the City's summary-judgment motion, the Nicolais asserted that Officer Gonzales was not protected from liability by official immunity, and the TTCA waives governmental immunity for the City. According to the Nicolais, Gonzales was not performing a discretionary duty but was engaged in a ministerial act and the City had not conclusively proved that Gonzales was acting in good faith at the time of the collision. The Nicolais attached to their

---

[5] *See id.* § 101.021(1)(B).

5

summary-judgment response, among other things, certain HPD General Orders, the affidavit of Reiter, and the depositions of Gonzales, Detective Sartor, Baratta, Officer Cox, Officer Hart-Joseph, and HPD Officer L. Hinojosa.[6]

In her deposition, Officer Gonzales testified that on October 2, 2013, she was on patrol at Ellington Field Airport around 2:00 a.m. Gonzales was in her patrol car parked in a parking lot at the airport when she received a call from airport security about the decedent. Airport security reported that the decedent was on airport property and was a "DWI suspect." When Gonzales arrived at the decedent's location, the decedent was barefoot and "sitting on the curb" next to her car. Gonzales spoke to the decedent, who disclosed that she had a knife, of which Gonzales took possession. The decedent also provided Gonzales with her driver's license. According to Gonzales, the decedent was intoxicated and could not stand up on her own. Gonzales held the decedent up so that she would not fall, placed her

---

[6] *See Warnke v. Nabors Drilling USA, L.P.*, 358 S.W.3d 338, 345 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (trial court can rely on entire record, including evidence attached to response, as basis for ruling on summary-judgment motion). I note that the City objected to certain evidence attached to the Nicolais' summary-judgment response. The City states that although the trial court did not rule on its objections to the Nicolais' evidence, it preserved error by objecting in the trial court to the trial court's failure or refusal to rule. To the extent that the City complains that the trial court erred in refusing to rule on its objections to certain evidence attached to the Nicolais' summary-judgment response and that evidence should not be considered, because of the ultimate disposition I would reach in this case, I need not address this complaint by the City. *See* TEX. R. APP. P. 47.1.

in handcuffs, and assisted the decedent to the patrol car where Gonzales put her in the back seat.

Officer Gonzales stated that she placed the decedent in the patrol car as the decedent was intoxicated and for the decedent's safety because she could not stand up and could get hurt. Gonzales did not arrest the decedent but put her in "protective custody" to take her to the sobering center in downtown Houston. Gonzales was not "taking her to jail."

After placing the decedent in her patrol car, Officer Gonzales requested the location of the sobering center because she had never been there before. And while driving the decedent to the sobering center, Gonzales had to stop to get directions or look at her "onboard computer to make sure [she was] going the right direction." Gonzales made "wrong turns" on the way to the sobering center. Before the collision, Gonzales was driving her patrol car slowly on Chartres Street in downtown Houston while she looked for the sobering center and at the street intersections to make sure she was going the right way. At the time of the collision, about 3:00 a.m. or 3:30 a.m., Gonzales was not looking at her "onboard computer." Yet, before entering the intersection where the collision occurred, Gonzales did not "look right or left." Gonzales did not see Moser's car before it hit the patrol car. Gonzales noted that she had viewed a videotaped recording of the collision and it showed Moser's car "running three [red traffic] lights" before hitting the patrol car.

7

In her deposition, Dr. Grossberg testified that about two to three hours before the decedent's death, her blood alcohol concentration ("BAC") was 0.20, and at the time of her death, the decedent's BAC was 0.17, which was more than twice the legal limit.[7] Dr. Grossberg also testified that the decedent had used marijuana before her death, and the intoxicating compound tetrahydrocannabinol ("THC")[8] was present in the decedent's blood. Because the decedent appeared to be intoxicated, Officer Gonzales placed her in the patrol car and began transporting her to the sobering center. Gonzales, when she encountered the decedent, would not have been able to determine whether the decedent was going to become "more impaired" over time or whether the decedent "was already sobering up." Gonzales had to assist the decedent in standing.

In his deposition, Detective Sartor testified that he is a crash reconstructionist. As to the collision, Sartor stated that Officer Gonzales was driving to the sobering center, which was near Chartres Street in downtown Houston. Moser, the other driver, approached the intersection at Chartres Street and Texas Avenue and drove through a red traffic light. At the time, Gonzales's lane of travel "had a green [traffic] light." When Moser's car struck Gonzales's patrol car, the patrol car rotated

---

[7]     *See* TEX. PENAL CODE ANN. § 49.01(2)(B).

[8]     THC is an active ingredient in marijuana. *See Randle v. State*, No. 01-19-00916-CR, 2020 WL 7391713, at *1 n.1 (Tex. App.—Houston [1st Dist.] Dec. 17, 2020, pet. ref'd) (mem. op.).

8

counter-clockwise several times and the decedent was thrown out of the patrol car onto the sidewalk. The decedent was "fatally injured as a result of . . . Moser's actions." According to Sartor, the decedent did not have her seat belt buckled at the time of the crash, and it was more likely than not that the decedent would not have been ejected from the patrol car if her seat belt had been buckled. And Gonzales, under HPD policies, was required to buckle the decedent's seat belt while she was a passenger in the back seat of Gonzales's patrol car. Sartor did not know whether Gonzales had buckled the decedent's seat belt the night of the collision.

Detective Sartor also testified that Moser's BAC on the night of the collision was 0.18, which is more than twice the legal limit.[9] Five or four seconds before hitting Officer Gonzales's patrol car, Moser had the gas pedal on her car "pressed all the way down," and she was "flooring it." About three seconds before hitting Gonzales's patrol car, Moser had her gas pedal pressed half-way down. Two seconds before hitting Gonzales's patrol car, Moser had the gas pedal pressed down "a little bit," but "she[] [was] still on the gas." One second before hitting Gonzales's patrol car, Moser "still had her f[oot] on the accelerator pedal." At the time of the collision, Moser was driving above the speed limit and Gonzales was driving about ten miles per hour.

---

[9]    *See* TEX. PENAL CODE ANN. § 49.01(2)(B).

9

As to Officer Gonzales, Detective Sartor testified that Gonzales had the authority to transport the decedent to the sobering center. And based on the decedent's intoxication level, she was a danger to herself and others. Sartor stated that given what Gonzales "kn[ew] about [the decedent's] condition when [she] first encountered her" on the night of the collision, a reasonably prudent law enforcement officer would not have left the decedent where Gonzales found her on airport property sitting, barefoot, on the curb next to her car because the decedent could have been assaulted and could have gotten into her car and driven off while intoxicated and possibly killed herself or someone else. The decedent "needed to get to a safe place." Additionally, according to Sartor, a reasonably prudent law enforcement officer could have believed that the need to transport the decedent to the sobering center outweighed the risk of harm to the decedent during transport; a reasonably prudent law enforcement officer could have believed that the need to get the decedent to the sobering center outweighed the risk of harm to decedent even if the decedent's seat belt was not buckled; and a reasonably prudent law enforcement officer could have believed that the need to get the decedent to the sobering center outweighed the risk of harm from Gonzales's driving the patrol car.

In his deposition, Baratta testified that at the time of the collision, Officer Gonzales was taking the decedent to the sobering center, and the decedent had not been arrested. When asked whether the decedent was being transported to the

10

sobering center because she was intoxicated, Baratta responded, "I have no reason to disagree with that." And he had "no reason to disagree" that the decedent's BAC was 0.17 or 0.20 at the time of the collision. According to Baratta, it appeared that the decedent's seat belt was not buckled at the time of the collision and she was ejected from the patrol car as a result. Baratta did not know how the decedent ended up with an unbuckled seat belt.

As to Moser, Baratta testified that about five seconds before the collision, Moser was driving eighty-three miles per hour, with "full throttle" and "no brake." About four seconds before the collision, Moser was driving eighty-five miles per hour, with "100 percent throttle" and "the brake . . . off." Three seconds before the collision, Moser was driving eighty-six miles per hour, with "25 percent throttle" and "the brake . . . off." One second before the collision, Moser was driving eighty-three miles per hour, with the "throttle . . . still at 25 percent." The speed limit for the street on which Moser was driving at the time of the collision was thirty miles per hour.

In his deposition, Sergeant Izaguirre testified that at the time of the collision, the decedent was being transported in the back seat of Officer Gonzales's patrol car to the sobering center. According to Izaguirre, the sobering center was "for non-violent intoxicated suspects." When a law enforcement officer encounters a publicly-intoxicated person, she has the option to either take the person to jail or to

the sobering center. Law enforcement officers in such situations "normally go to a sob[ering] center." At the time of the collision, the decedent was in the custody of HPD and was a suspect for the offense of public intoxication.

In his deposition, Reiter testified that HPD General Order 500-11, dated May 15, 2013 and titled "Handling Publicly Intoxicated Persons," leaves to a law enforcement officer's own judgment, the decision of whether to transport a publicly-intoxicated person to jail or to the sobering center. General Order 500-11 also leaves to a law enforcement officer's own judgment the determination of whether an intoxicated person is a danger to herself or to other people as well as the determination of whether an intoxicated person needs further medical evaluation because she is unconscious, bleeding from a head injury, experiencing a serious medical condition, or acute alcohol poisoning or whether she "should be taken to the sobering center." Additionally, General Order 500-11 leaves to a law enforcement officer's own judgment the determination of whether an intoxicated person is displaying signs of active aggression or a mental health crisis and should not be taken to the sobering center, but to jail or to the hospital, respectively.

Reiter also testified that HPD General Order 500-02, dated June 27, 2013 and titled "Handling and Transporting Prisoners and Other Persons," leaves to the law enforcement officer's discretion the determination of the "safest and most direct route when transporting someone."

12

As to the decedent, Reiter stated that when Ellington Field Airport security first encountered the decedent on the night of the collision, she was "attempting to push her car down the road barefoot." The decedent exhibited signs of intoxication, was unable to stand up on her own, and had "an odor of alcohol." At the time of her death, the decedent's BAC was 0.17. The decedent was in the back seat of Officer Gonzales's patrol car at the time of the collision because the decedent was intoxicated. If the decedent had been left alone in the dark to push her car in the middle of the night, she would have been vulnerable and would have faced significant risks.

Reiter also testified that Officer Gonzales initially decided to take the decedent to jail, but then she changed her mind and decided to take the decedent to the sobering center instead. As Reiter explained, Gonzales "made that choice"; "[s]he deliberated and made that choice, so that [was] . . . a conscious choice." According to Reiter, no reasonably prudent law enforcement officer would have left the decedent where Gonzales found her on airport property sitting, barefoot, on the curb next to her car. And although there may be more intoxicated drivers on the road around 3:30 a.m., Gonzales should have attempted to transport the decedent to the sobering center because "the need to get [the decedent] to the sobering center outweighed the risk of those other drivers." Reiter noted that while Gonzales was

transporting the decedent to the sobering center, she had not been told that "there was a drunk driver in the area travelling really fast."

Reiter further stated that when Officer Gonzales entered the intersection at Chartres Street and Texas Avenue, the traffic light for her lane of travel was green. Gonzales did not ignore traffic signs or signals. On the other hand, Moser's lane of travel "had [a] red [traffic] light" at the intersection of Chartres Street and Texas Avenue.

In his affidavit, Reiter testified that on the night of the collision, Officer Gonzales was "called to investigate a woman who was possibly publicly intoxicated." Gonzales found the decedent sitting down, and the decedent could not stand up on her own. Reiter stated: "Given the fact that it was approximately 3:00 a.m. and the [decedent] appeared to be intoxicated, it was not a discretionary act by . . . Gonzale[s] to make the decision to get [the decedent] off the street and take her to a safer place." According to Reiter, Gonzales did not buckle the decedent's seat belt when she placed the decedent in her patrol car. Gonzales was negligent in pulling into the intersection where the collision occurred "without [first] looking right or left."

Reiter also testified that it was not discretionary to buckle a back-seat passenger's seat belt. And "the act of seat belting [the decedent] was ministerial and mandated, not discretionary in any way." "[A]t the time Officer Gonzale[s] was

14

driving her patrol [car] with [the decedent] as a passenger to the [s]ober[ing] [c]enter, she was driving in a non-emergency/non-urgent situation, which . . . [was] ministerial and not discretionary." In Reiter's opinion, "there [was] no evidence that . . . Gonzale[s] acted in good faith when she failed to seat belt [the decedent] and when she slowed down to an almost stop at a green [traffic] light then entered the intersection without looking."

In his deposition, Officer Cox testified that on the night of collision, the decedent was a passenger in the back seat of a patrol car. She had been "picked up" and was being transported to the sobering center. Moser, who was intoxicated, was the driver of the car that hit the patrol car after running a red traffic light. According to Cox, at the time of the collision, it was unlikely that the decedent's seat belt was buckled in the patrol car. Officer Gonzales may not have seen Moser's car approach the intersection where the collision occurred because "there were several concrete pillars next to the road."

Officer Cox also testified that in general it would be prudent for drivers to "look[] to make sure nobody [was] coming in the intersection against the [traffic] light." And HPD's policies and procedures and Texas law require law enforcement officers to buckle the seat belts for their back-seat passengers. Law enforcement officers must also keep a proper lookout and drive safely. Yet Cox stated that, in investigating the crash, he never encountered any evidence that indicated that Officer

15

Gonzales was not driving safely on the night of the collision and the "crash report" did not find that Gonzales was at fault.

In her deposition, Officer Hart-Joseph testified that she was "the primary investigator for the [HPD] fatality unit" on the night of the collision. On that night, Officer Gonzales was taking the decedent to jail, but then decided to take the decedent to the sobering center in downtown Houston. In the minutes before the collision, Gonzales was trying to locate the sobering center. Moser, the driver of the car that hit the patrol car, was driving about seventy or eighty miles per hour at the time of the collision. Moser admitted to emergency-assistance personnel that she had been "drinking and driving." Gonzales's lane of travel "had the green [traffic] light" before the collision.

Officer Hart-Joseph stated that she did not believe that the decedent's seat belt was buckled at the time of the collision, and she recalled that Officer Gonzales, at one point, stated that she did not buckle the decedent's seat belt and, at another time, stated that she usually buckles a back-seat passenger's seat belt and to the best of her knowledge, she had buckled the decedent's seat belt when she placed her in the patrol car. Hart-Joseph testified that Gonzales was required to buckle the decedent's seat belt when she placed her in the back seat of the patrol car. And a reasonably prudent officer like Gonzales would have buckled the seat belt of a handcuffed

16

passenger in the back seat of a patrol car. HPD policies and Texas law required the decedent's seat belt to be buckled.

Officer Hart-Joseph also testified that generally there are more intoxicated drivers on the roadways after midnight. But when asked whether a reasonably prudent driver "look[s] both ways before entering an intersection, even if" her lane of travel "ha[s] a green [traffic] light," Hart-Joseph responded, "No. Mostly[,] [a driver] just look[s] directly at the green [traffic] light and when it turns green, [she] go[es]." And when asked whether she recalled learning anything in HPD officer training about being "vigilant when entering intersections because not everybody . . . follows the green light/red light rule," Hart-Johnson respond, "No."

In her deposition, Officer Hinojosa testified that HPD had a policy that required a back-seat passenger in a patrol car to have her seat belt buckled. The failure to buckle a back-seat passenger's seat belt violated HPD's policy and Texas law. Officer Gonzales had a duty to buckle the decedent's seat belt while transporting the decedent to the sobering center in her patrol car. Hinojosa did not know whether the decedent's seat belt had been buckled. According to Hinojosa, HPD General Order 500-11, titled "Handling Publicly Intoxicated Persons," permitted a law enforcement officer to take an intoxicated person to the sobering center in lieu of arresting her.[10]

---

[10] The City filed a reply to the Nicolais' response.

17

The trial court denied the City's summary-judgment motion.

**Standard of Review**

Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money damages. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *see also Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323–24 (Tex. 2006) ("Sovereign immunity protects the State, its agencies, and its officials from lawsuits for damages."). Although the terms "sovereign immunity" and "governmental immunity" are often used interchangeably, sovereign immunity "extends to various divisions of state government, including agencies, boards, hospitals, and universities," while governmental immunity "protects political subdivisions of the State, including counties, cities, and school districts." *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist.*, 212 S.W.3d at 323–24; *see also Odutayo v. City of Houston*, No. 01-12-00132-CV, 2013 WL 1718334, at *2 n.8 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.). The Court interprets statutory waivers of sovereign immunity and governmental immunity narrowly, as the Texas Legislature's intent to waive immunity must be clear and unambiguous. *See LMV-AL Ventures, LLC v. Tex. Dep't of Aging & Disability Servs.*, 520 S.W.3d 113,

18

120 (Tex. App.—Austin 2017, pet. denied); *see also* TEX. GOV'T CODE ANN. § 311.034. Without an express waiver of sovereign immunity or governmental immunity, courts do not have subject-matter jurisdiction over suits against the State or its political subdivisions. *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224–25 (Tex. 2004); *see also Harris Cnty. v. S. Cnty. Mut. Ins. Co.*, No. 01-13-00870-CV, 2014 WL 4219472, at *2 (Tex. App.—Houston [1st Dist.] Aug. 26, 2014, no pet.) (mem. op.) ("Governmental immunity from suit deprives a trial court of subject-matter jurisdiction.").

A governmental unit may raise the affirmative defense of sovereign immunity or governmental immunity and challenge the trial court's jurisdiction "through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). The Court reviews a trial court's decision on summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007).

To prevail on a summary-judgment motion, the movant has the burden of establishing that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a governmental unit, as the movant, raises the affirmative

19

defense of sovereign immunity or governmental immunity and challenges the trial court's subject-matter jurisdiction in a summary-judgment motion, it must establish that it is entitled to immunity as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Rivera v. City of Houston*, No. 01-19-00629-CV, 2020 WL 7502054, at *3 (Tex. App.—Houston [1st Dist.] Dec. 22, 2020, no pet.) (mem. op.); *Oakbend Med. Ctr. v. Martinez*, 515 S.W.3d 536, 542 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Once the governmental unit conclusively establishes its entitlement to sovereign immunity or governmental immunity, the burden shifts to the non-movants to present evidence sufficient to create a fact issue on at least one element of either the affirmative defense or an exception to that defense. *City of Houston v. Carrizales*, No. 01-20-00699-CV, 2021 WL 3556216, at *3 (Tex. App.—Houston [1st Dist.] Aug. 12, 2021, pet. denied) (mem. op.); *Oakbend*, 515 S.W.3d at 542. If the non-movants cannot meet their burden, the suit is barred because of sovereign immunity or governmental immunity, and summary judgment is proper. *Carrizales*, 2021 WL 3556216, at *3; *Oakbend*, 515 S.W.3d at 542; *see also Shives v. State*, 743 S.W.2d 714, 715 (Tex. App.—El Paso 1987, writ denied) ("[A] motion for summary judgment may be based on a showing that the cause of action is barred as a matter of law by the affirmative defense of governmental immunity.").

## Governmental Immunity

In its sole issue, the City argues that the trial court erred in denying its summary-judgment motion because the trial court lacks subject-matter jurisdiction over the Nicolais' suit. The City asserts that it is entitled to governmental immunity, and the TTCA only waives the City's governmental immunity in suits arising from the negligent operation or use of a motor-driven vehicle by a governmental employee acting within the scope of her employment if the employee would be personally liable to the plaintiffs under Texas law. And here, Officer Gonzales is not liable to the Nicolais under Texas law because she is protected from liability by official immunity.

The TTCA provides a limited waiver of immunity for certain suits against governmental units. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008); *City of Dallas v. Hillis*, 308 S.W.3d 526, 530 (Tex. App.—Dallas 2010, pet. denied). The City is a governmental unit protected by governmental immunity, absent waiver. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(A); *Carrizales*, 2021 WL 3556216, at *4. Relevant here, the TTCA waives a governmental unit's immunity for a death proximately caused by the negligence of a governmental employee, such as a law enforcement officer, acting in the scope of her employment, if the death arises from the operation or use of a motor-driven vehicle and the employee would

21

be personally liable to the plaintiffs under Texas law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1); *City of San Antonio v. Riojas*, 640 S.W.3d 534, 536 (Tex. 2022); *Tex. Dep't of Pub. Safety v. Rodriguez*, 344 S.W.3d 483, 488 (Tex. App.— Houston [1st Dist.] 2011, no pet.).

Official immunity is an affirmative defense that protects a governmental employee from personal liability. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *Harris Cnty.*, 2014 WL 4219472, at *3; *see also Telthorster v. Tennell*, 92 S.W.3d 457, 460–61 (Tex. 2002) ("Official immunity is an affirmative defense that shields governmental employees from personal liability so that they are encouraged to vigorously perform their official duties."). Thus, a governmental employee who is protected by official immunity cannot be liable to the plaintiffs under Texas law. *Clark*, 38 S.W.3d at 580; *Rivera*, 2020 WL 7502054, at *3 ("[A] governmental employee who holds official immunity for her actions or omissions[] would not be personally liable under Texas law" (internal quotations omitted)); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1); *Alamo Workforce Dev., Inc. v. Vann*, 21 S.W.3d 428, 434 (Tex. App.—San Antonio 2000, no pet.) (governmental employees are entitled to official immunity when sued in their individual capacity for official acts). And, as a result, the governmental unit who employs that employee is also shielded from liability because there is no valid waiver of governmental immunity under the TTCA. *See Riojas*, 2022 WL 495473, at *3 ("If [an] employee

22

is protected from liability by official immunity, the employee is not personally liable to the claimant and the government[al] [unit] retains its [governmental] immunity under [the TTCA]." (first alteration in original)); *Clark*, 38 S.W.3d at 580; *Harris Cnty.*, 2014 WL 4219472, at \*2–3; *State v. McGeorge*, 925 S.W.2d 105, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1).

A governmental employee is entitled to official immunity from a suit arising from (1) the performance of the employee's discretionary duties (2) conducted within the scope of her authority and (3) in good faith. *Telthorster*, 92 S.W.3d at 461; *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994); *see also Riojas*, 2022 WL 495473, at \*3 ("Official immunity is an affirmative defense that inures all governmental employees who perform discretionary functions in good faith and within their authority." (internal quotations omitted)). To obtain summary judgment, a governmental unit, asserting that its governmental employee is protected from liability by official immunity, must conclusively establish each of those elements. *Telthorster*, 92 S.W.3d at 461; *Chambers*, 883 S.W.2d at 653; *Gomez v. City of Houston*, 587 S.W.3d 891, 897 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("Because official immunity is an affirmative defense, the burden rests on the City to establish all elements of the defense."); *see also Rivera*, 2020 WL 7502054, at \*2 ("When a governmental unit raises the affirmative defense of

23

governmental immunity through a summary-judgment motion, it must establish the affirmative defense as a matter of law."). If the governmental unit does not prove each element of official immunity, the burden does not shift to the plaintiffs to come forward with controverting evidence. *Harris Cnty.*, 2014 WL 4219472, at *3; *Rodriguez*, 344 S.W.3d at 488–89. Yet, if the governmental unit establishes the affirmative defense of official immunity, the burden shifts to the plaintiffs, as the non-movants, to present evidence sufficient to create a fact issue on at least one element of the affirmative defense. *See Rivera*, 2020 WL 7502054, at *3. Here, the parties do not appear to dispute that Officer Gonzales was acting within the scope of her authority when the collision occurred; thus, the focus is on whether the City conclusively established that Gonzales was performing a discretionary duty in good faith at the time of the collision.

## A. Discretionary Duty

The City argues that it conclusively established that Officer Gonzales was performing a discretionary duty at the time of the collision because she was transporting the decedent to the sobering center in downtown Houston and "effectuating arrests, handling publicly intoxicated persons, and transporting prisoners and other persons all require [law enforcement] officers to exercise their own judgment."

"If an action involves personal deliberation, decision, and judgment, it is discretionary; an action that requires obedience to orders or the performance of a duty to which the [governmental] employee has no choice is ministerial." *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *see also Chambers*, 883 S.W.2d at 654; *City of Dallas v. Brooks*, 349 S.W.3d 219, 225 (Tex. App.—Dallas 2011, no pet.). An act is ministerial if "the law prescribes and defines the dut[y] to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Chambers*, 883 S.W.2d at 654 (internal quotations omitted). In determining whether an act is discretionary, the issue is whether the governmental employee was performing a discretionary function, not whether she had the discretion to do an allegedly wrongful act while discharging that function or whether the employee's job description includes discretionary duties. *Chambers*, 883 S.W.2d at 653; *Ramos*, 35 S.W.3d at 727. A dominant factor in determining whether an act should be classified as a "ministerial act" or a "discretionary duty" involves searching for a law, regulation, or policy that controls the act of the governmental employee and allows no leeway for individual deliberation. *Tex. Dep't of Crim. Justice v. Watt*, 949 S.W.2d 561, 565 (Tex. App.—Waco 1997, no writ); *Harris Cnty. v. DeWitt*, 880 S.W.2d 99, 101 (Tex. App.—Houston [14th Dist.] 1994), *aff'd*, 904 S.W.2d 650 (Tex. 1995).

Generally, non-emergency driving of a patrol car by a law enforcement officer while on official business is a ministerial act that does not entitle an officer, who is involved in an accident, to official immunity. *Rivera*, 2020 WL 7502054, at *3*; City of Houston v. Hatton*, No. 01-11-01068-CV, 2012 WL 3528003, at *3 (Tex. App.— Houston [1st Dist.] Aug. 16, 2012, pet. denied) (mem. op.); *Brooks*, 349 S.W.3d at 225; *City of Austin v. Albarran*, No. 03-10-00328-CV, 2011 WL 2533751, at *3 (Tex. App.—Austin June 23, 2011, no pet.) (mem. op.); *see also City of Wichita Falls v. Norman*, 963 S.W.2d 211, 216–17 (Tex. App.—Fort Worth 1998, pet. dism'd w.o.j.) (law enforcement officer who caused collision while executing only patrol duties was not shielded by official immunity). The basic rationale for this rule is that under normal circumstances, law enforcement officers, like other citizens, must obey traffic regulations when operating patrol cars and do not have discretion about whether to do so. *Albarran*, 2011 WL 2533751, at *3.

In some situations though, a law enforcement officer's operation of a patrol car is considered a discretionary function. *Albarran*, 2011 WL 2533751, at *4. When an officer's operation of a patrol car "involves personal deliberation or the exercise of the officer's professional expertise, decision or judgment," the manner of driving may become a discretionary act. *Rivera*, 2020 WL 7502054, at *3; *see, e.g.*, *Chambers*, 883 S.W.2d at 655 (deeming law enforcement officer's decision to undertake and conduct high-speed pursuit of suspect discretionary function); *Brooks*,

26

349 S.W.3d at 225 ("Such situations include, but are not limited to, high-speed chases, investigations, and traffic stops."); *Albarran*, 2011 WL 2533751, at *4 (when "a [law enforcement] officer is performing certain law enforcement functions involving discretion and judgment," "this discretion and judgment can extend to whether and how the officer utilizes a motor vehicle in performing these functions"); *see also Hatton*, 2012 WL 3528003, at *3.

In its summary-judgment motion, the City argued that Officer Gonzales was performing a discretionary duty at the time of the collision because she was transporting the decedent, whom she believed was intoxicated, to the sobering center in downtown Houston.

In her deposition, Officer Gonzales testified that on October 2, 2013, while on patrol at Ellington Field Airport, around 2:00 a.m., she received a call from airport security about the decedent. Airport security reported to Gonzales that the decedent was on airport property and was a "DWI suspect." When Gonzales arrived at the decedent's location, the decedent was barefoot and "sitting on the curb" next to her car. The decedent was intoxicated and could not stand up on her own. Gonzales had to hold the decedent up so that she would not fall and had to assist the decedent to Gonzales's patrol car, where she put the decedent in the back seat. Gonzales placed the decedent in her patrol car so that she could take the decedent to the sobering center in downtown Houston. While transporting the decedent to the

sobering center, at around 3:00 a.m. or 3:30 a.m., Moser struck Gonzales's patrol car with her car.

HPD General Order 500-11, dated May 15, 2013 and titled "Handling Publicly Intoxicated Persons," states:

> When appropriate and available, *officers are encouraged to use approved alternatives for handling persons who are in violation of Texas Penal Code, [s]ection 49.02, Public Intoxication*. When circumstances meet the criteria outlined in this General Order, officers should divert publicly intoxicated individuals to the custody of a responsible adult or the Houston Center for Sobriety (herein referred to as the 'Center') as an alternative to arrest.
>
> . . . .
>
> Public intoxication should not serve as the sole justification for incarceration and *every effort should be made to divert eligible intoxicated persons to the custody of a responsible adult or the Center. . . .*
>
> If an individual is intoxicated on a substance other than alcohol, such as marijuana, glue, paint, or any other drug, he or she shall be handled in the same manner as if they were under the influence of alcohol and *may be diverted to the Center*.

(Emphasis added.); *see Ramos*, 35 S.W.3d at 727 ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . ."); *cf. Watt*, 949 S.W.2d at 565–66 (act classified as "a ministerial act" when "a law, regulation, or policy controls the act of the governmental employee and allows no leeway for individual deliberation," but when policy allows for exercise of individual judgment and deliberation in conforming to policy guidelines, governmental employee performs

28

discretionary duty (internal quotations omitted)).  General Order 500-11 defines "[i]ntoxicated" as "[n]ot having the normal use of mental or physical faculties by reason of introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or having an alcohol concentration of 0.08 or more."  (Emphasis omitted.)  A person commits the offense of public intoxication if "the person appears in a public place while intoxicated to the degree that the person may endanger [herself] or another."  TEX. PENAL CODE ANN. § 49.02(a).  General Order 500-11 leaves it up to the law enforcement officer to determine if a person is intoxicated and has violated Texas Penal Code section 49.02.

General Order 500-11 cites as authority for its policy Texas Code of Criminal Procedure article 14.031, which allows a law enforcement officer to take or send a publicly-intoxicated person to certain places, rather than arresting the intoxicated person.  It provides:

> In lieu of arresting an individual who is not a child . . . and who commits an offense under [s]ection 49.02, Penal Code, a peace officer *may* release the individual if: (1) the officer believes detention in a penal facility is unnecessary for the protection of the individual or others; and (2) the individual: (A) is released to the care of an adult who agrees to assume responsibility for the individual . . . .

Act of May 21, 2009, 81st Leg. R.S., ch. 311, 2009 Tex. Gen. Laws. 832 (amended 2019) (current version at TEX. CODE CRIM. PROC. ANN. art. 14.031(a)) (emphasis added); *see also Ramos*, 35 S.W.3d at 727 ("If an action involves personal

deliberation, decision, and judgment, it is discretionary . . . ."); *cf. Watt*, 949 S.W.2d at 565–66 (act classified as "a ministerial act" when "a law, regulation, or policy controls the act of the governmental employee and allows no leeway for individual deliberation," but when policy allows for exercise of individual judgment and deliberation in conforming to policy guidelines, governmental employee performs discretionary duty (internal quotations omitted)). According to General Order 500-11, the sobering center in downtown Houston "is able to serve as the responsible adult under" Texas Code of Criminal Procedure article 14.031.

General Order 500-11 also provides that certain persons may not be transported to the sobering center, even if they are intoxicated, but allows the law enforcement officer to determine whether or not a particular intoxicated person falls into any of the categories. *See Ramos*, 35 S.W.3d at 727 ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . ."). Intoxicated persons who may not be transported to the sobering center include: those who are unconscious, bleeding from a head injury, or experiencing a serious medical condition; those who display signs of active aggression; those who exhibit signs of being suicidal or having a mental health crisis; those who cannot be identified as required by the general order; those with "a Class C [misdemeanor offense] or higher warrant"; those who are also being charged with "a Class C [misdemeanor] offense involving violence, narcotics, vice, theft, or criminal mischief or any greater

30

offense"; those who are suspected of driving under the influence of alcohol or other narcotics; and those "with an Immigration and Custom Enforcement detainer."

In his deposition, the Nicolais' expert witness Reiter testified that HPD General Order 500-11 leaves to a law enforcement officer's own judgment the decision of whether to transport a publicly-intoxicated person to jail or to the sobering center.[11]  *See Rivera*, 2020 WL 7502054, at *3 (when law enforcement officer's operation of patrol car "involves personal deliberation or the exercise of the officer's professional expertise, decision, or judgment," manner of driving may become discretionary act); *Sanchez v. Boone*, 579 S.W.3d 526, 532–33 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (when policy allows for law enforcement officers to use their own judgment, officer's conduct is discretionary); *Ramos*, 35 S.W.3d at 727 ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . ."); *see also Albarran*, 2011 WL 2533751, at *4 (when "a [law enforcement] officer is performing certain law enforcement functions involving

---

[11]     Reiter also testified that General Order 500-11 leaves a number of other things to a law enforcement officer's own judgment, including: the determination of whether an intoxicated person is a danger to herself or to other people; the determination of whether an intoxicated person needs further medical evaluation; and the determination of whether an intoxicated person is displaying signs of active aggression or a mental health crisis and should not be taken to the sobering center, but to jail or to the hospital, respectively. *See Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . .").

discretion and judgment," "this discretion and judgment can extend to whether and how the officer utilizes a motor vehicle in performing these functions"). And Reiter stated that General Order 500-11 leaves to a law enforcement officer's own judgment the determination of whether an intoxicated person "should be taken to the sobering center." *See Rivera*, 2020 WL 7502054, at *3; *Sanchez*, 579 S.W.3d at 532–33; *Ramos*, 35 S.W.3d at 727; *see also Albarran*, 2011 WL 2533751, at *4. Reiter also explained that on the night of the collision, Officer Gonzales initially decided to take the decedent to jail, but then changed her mind and decided to take the decedent to the sobering center instead. According to Reiter, Gonzales "made [a] choice"; "[s]he deliberated and made that choice, so that [was] . . . a conscious choice." *See Rivera*, 2020 WL 7502054, at *3; *Ramos*, 35 S.W.3d at 727; *see also Albarran*, 2011 WL 2533751, at *4.

Similarly, Sergeant Izaguirre, in his deposition, testified that when a law enforcement officer encounters a publicly-intoxicated person, she has the option to either take the person to jail or to the sobering center. *See Rivera*, 2020 WL 7502054, at *3 (when law enforcement officer's operation of patrol car "involves personal deliberation or the exercise of the officer's professional expertise, decision, or judgment," manner of driving may become discretionary act); *Sanchez*, 579 S.W.3d at 532–33 (when policy allows for law enforcement officers to use their own judgment, officer's conduct is discretionary); *Ramos*, 35 S.W.3d at 727 ("If an action

32

involves personal deliberation, decision, and judgment, it is discretionary . . . ."); *see also Albarran*, 2011 WL 2533751, at *4 (when "a [law enforcement] officer is performing certain law enforcement functions involving discretion and judgment," "this discretion and judgment can extend to whether and how the officer utilizes a motor vehicle in performing these functions"). And Officer Hart-Joseph testified that on the night of the collision, Officer Gonzales was taking the decedent to jail, but then made the decision to transport the decedent to the sobering center. *See Rivera*, 2020 WL 7502054, at *3; *Sanchez*, 579 S.W.3d at 532–33; *Ramos*, 35 S.W.3d at 727; *see also Albarran*, 2011 WL 2533751, at *4.

Further, HPD General Order 500-02, titled "Handling and Transporting Prisoners and Other Persons," states that "[a]ll transports [of persons by law enforcement officers] shall be made via the safest, most direct route." And Reiter testified that General Order 500-02 leaves to the law enforcement officer's discretion the determination of the "safest and most direct route when transporting someone." *See Ramos*, 35 S.W.3d at 727 ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . .").

It is undisputed that at the time of the collision Officer Gonzales was transporting the decedent, whom she believed was intoxicated, to the sobering center in downtown Houston, rather than to jail. The transportation of inmates has been held to be a discretionary duty, rather than a ministerial, act. *See Wheelock v.*

33

*Behrens*, No. 04-01-00312-CV, 2002 WL 112545, at \*2 (Tex. App.—San Antonio Jan. 30, 2002, no pet.) (not designated for publication) (law enforcement officer was performing discretionary duty when transporting defendant from Kerr County Jail to Bexar County Jail); *Rinehart v. Britton*, No. 14-99-01076-CV, 2000 WL 1715902, at \*3–4 (Tex. App.—Houston [14th Dist.] Nov. 16, 2000, no pet.) (not designated for publication) (noting transportation of inmates involves discretionary acts); *Scott v. Britton*, 16 S.W.3d 173, 178–79 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (same); *Watt*, 949 S.W.2d at 565–66 (prison officers performed discretionary duty, not ministerial act, when removing inmate from cell and transporting him to infirmary for mandatory examination); *see also Gonzales v. Kelley*, No. 01-10-00109-CV, 2010 WL 2650615, at \*1–3 (Tex. App.—Houston [1st Dist.] July 1, 2010, no pet.) (mem. op.) (parties did not dispute that law enforcement officers were performing discretionary duty when they transported inmate to mental health unit); *Casas v. Gilliam*, 869 S.W.2d 671, 674 (Tex. App.—San Antonio 1994, no writ) (emergency medical technician's decision to transport decedent to particular hospital was discretionary act).  Here, Gonzales made the decision, based on her belief that the decedent was intoxicated, to transport the decedent to the sobering center, rather than to jail, and she was thus performing a discretionary duty at the time of the collision.  *See Rivera*, 2020 WL 7502054, at \*3 (when law enforcement officer's operation of patrol car "involves personal deliberation or the exercise of the

34

officer's professional expertise, decision, or judgment," manner of driving may become discretionary act); *Sanchez*, 579 S.W.3d at 532–33 (when policy allows for law enforcement officers to use their own judgment, officer's conduct is discretionary); *Ramos*, 35 S.W.3d at 727 ("If an action involves personal deliberation, decision, and judgment, it is discretionary . . . ."); *see also Albarran*, 2011 WL 2533751, at *4 (when "a [law enforcement] officer is performing certain law enforcement functions involving discretion and judgment," "this discretion and judgment can extend to whether and how the officer utilizes a motor vehicle in performing these functions"); *cf. Chambers*, 883 S.W.2d at 654 (ministerial acts are those "[w]here the law prescribes and defines the dut[y] to be performed with such precision and certainty as to leave nothing to exercise of discretion or judgment" (first alteration in original) (internal quotations omitted)).

In response to the City's summary-judgment motion, the Nicolais argued that the City had not conclusively established that Officer Gonzales was performing a discretionary duty at the time of the collision because "seat-belting a hand-cuffed passenger in the back[]seat of a patrol cruiser is [a] ministerial [act]."

The Nicolais' argument misses the mark. The proper inquiry is whether Officer Gonzales was performing a ministerial act or discretionary duty *when the collision occurred*. *See Hatton*, 2012 WL 3528003, at *3 (focusing on whether law enforcement officer was performing discretionary duty when collision occurred);

35

*Brooks*, 349 S.W.3d at 222–23, 225–27; *Albarran*, 2011 WL 2533751, at \*3 (issue was "whether the City met its burden to establish that [law enforcement officer] was performing a discretionary function . . . when the collision occurred" (internal quotations omitted)); *Harless v. Niles*, 100 S.W.3d 390, 396–98 (Tex. App.—San Antonio 2002, no pet.); *Norman*, 963 S.W.2d at 214 ("The issue we must decide . . . is whether the City [of Wichita Falls] established as a matter of law that [the law enforcement officer] was exercising discretionary duties in good faith at the time the accident occurred."); *see also Dickerson v. Davis*, 925 S.W.2d 123, 125–26 (Tex. App.—Amarillo 1996, writ dism'd w.o.j.) (focus should be on whether governmental employee was performing discretionary duty at time of plaintiff's injury). At the time of the collision, Gonzales was transporting the decedent, whom she believed was intoxicated, to the sobering center in downtown Houston—this is the conduct which must be determined to be ministerial or discretionary.

Notably, the Texas Supreme Court has directed appellate courts, in analyzing issues of official immunity, to describe a law enforcement officer's conduct broadly, rather than using a more specific description that is linked to the alleged wrong committed by the officer. *See Chambers*, 883 S.W.2d at 653–55; *Fink v. Anderson*, 477 S.W.3d 460, 469–70 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (analyzing *Chambers* and stating: "The Texas Supreme Court described the officer's conduct broadly. Instead of asking whether the officers had discretion to driv[e] unsafely, as

36

the appellate court had done, the Court considered whether 'engaging in a high-speed chase' was a discretionary act and held that it was."); *see also Downing v. Brown*, 935 S.W.2d 112, 114 (Tex. 1996) ("The court of appeals' analysis of whether [the governmental employee's] actions required discretion or judgment was too narrow."); *Deaver v. Bridges*, 47 S.W.3d 549, 553–54 (Tex. App.—San Antonio 2000, no pet.) ("[T]he focus is on the broad category of responsibility involved as opposed to some particular aspect of the responsibility."). By only analyzing whether Officer Gonzales had discretion to buckle the decedent's seat belt, the Nicolais do not focus on whether Gonzales was performing a discretionary duty at the time of the collision; rather, they focus on whether Gonzales had the discretion to do an allegedly wrongful act while discharging that function. That is not the appropriate inquiry. *See Chambers*, 883 S.W.2d at 653; *Ramos*, 35 S.W.3d at 727; *cf. Brooks*, 349 S.W.3d at 226–27 ("[T]he proper inquiry is *whether* [law enforcement officer] was operating his patrol car in an emergency situation, not *how* or in what manner he operated his vehicle while responding.").

Finally, although the Nicolais attached numerous exhibits to their response to the City's summary-judgment motion, none of the evidence—much of which focused solely on whether buckling the decedent's seat belt was a ministerial act— raised a genuine issue of material fact as to whether Officer Gonzales was performing a discretionary duty in transporting the decedent, whom she believed

37

was intoxicated, to the sobering center. But to the extent that the Nicolais relied, in their summary-judgment response, on Reiter's affidavit to assert that they had raised a genuine issue of material fact as to whether transporting the decedent to the sobering center was a discretionary duty, the affidavit only contains two relevant conclusory statements. In his affidavit, Reiter stated: "Given the fact that it was approximately 3:00 a.m. and the [decedent] appeared to be intoxicated, it was not a discretionary act by . . . Gonzale[s] to make the decision to get [the decedent] off the street and take her to a safer place" and "I also believe that at the time . . . Gonzale[s] was driving her patrol [car] with [the decedent] as a passenger to the [s]ober[ing] center, she was driving in a non-emergency/non[-]urgent situation, which in my opinion is ministerial and not discretionary." Conclusory statements of an expert witness are insufficient to create a question of fact to defeat summary judgment. *Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013); *McMahon v. Zimmerman*, 433 S.W.3d 680, 686–87 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (opinion is conclusory "if no basis for the opinion is offered, or the basis offered provides no support" for opinion).

Based on the foregoing, I would conclude that the City met its burden of conclusively establishing that Officer Gonzales was performing a discretionary duty when the collision occurred, and the Nicolais failed to raise a genuine issue of

38

material fact as to whether Gonzales was performing a discretionary duty at the time of the collision.

## B.     Good Faith

The City argues that it conclusively established that Officer Gonzales was acting in good faith at the time of the collision because a reasonably prudent law enforcement officer could have believed, based on the facts available to Gonzales, that the need to take the decedent to the sobering center outweighed any risk of harm and any purported negligence by Gonzales in transporting the decedent to the sobering center does not negate good faith.

Although the City has conclusively established that Officer Gonzales was performing a discretionary duty at the time of the collision, it must also establish that Gonzales was acting in good faith. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997). A court must measure the "good faith" requirement against a standard of objective legal reasonableness, without regard to the particular governmental employee's subjective state of mind. *Id.*; *see also Martinez v. Harris Cnty.*, 526 S.W.3d 557, 563 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (governmental employee's subjective state of mind or motive is irrelevant).

To be entitled to summary judgment, the City must conclusively prove that a reasonably prudent law enforcement officer, under the same or similar circumstances, could have believed Officer Gonzales's actions were justified based

39

on the information she possessed at the time. *Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897; *see also Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426 (Tex. 2004). In assessing what a reasonable person could have believed under the circumstances, the Court considers only the information that the law enforcement officer had at her disposal when she made her decisions, not facts that subsequently became known to her. *Telthorster*, 92 S.W.3d at 465; *Martinez*, 526 S.W.3d at 563. The City need not prove that it would have been unreasonable not to take these actions, or that all reasonably prudent law enforcement officers would have taken the same action. *Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897. Rather, the City must only prove that a reasonably prudent law enforcement officer, under the same or similar circumstances, *might* have reached the same decision. *Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897.

The good-faith standard is analogous to an abuse-of-discretion standard that protects "all but the plainly incompetent or those who knowingly violate the law." *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 643 (Tex. 2015) (internal quotations omitted); *see also Martinez*, 526 S.W.3d at 563. Thus, evidence of a law enforcement officer's negligence does not negate good faith. *Telthorster*, 92 S.W.3d at 465; *Martinez*, 526 S.W.3d at 563 ("[O]nly those who are plainly incompetent or knowingly violate the law lack the good faith necessary to be shielded by official immunity."); *see also Ballantyne*, 144 S.W.3d at 426 ("The standard of good faith

40

as an element of official immunity is not a test of carelessness or negligence, or a measure of a[] [governmental employee's] motivation."). Although in situations involving high-speed chases, law-enforcement pursuits, or emergency-response driving by law enforcement officers, courts employ a particularized need/risk analysis when evaluating good faith,[12] the public-safety concerns underlying the need/risk assessment in those situations are not implicated here. *See Riojas*, 2022 WL 495473, at *1, *3–7 (refusing to apply "[the] need-risk balancing analysis" to case involving "routine traffic management" because it was "outside the context of

---

[12] *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994) (holding law enforcement officer establishes good faith in law-enforcement-pursuit case by showing reasonably prudent officer could have believed it necessary to continue pursuit, balancing need for immediate law enforcement intervention against risk of harm to public); *see also Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997) (extending *Chambers* need/risk analysis to high-speed emergency responses); *Fayette Cnty. v. Ryder Integrated Logistics, Inc.*, No. 04-16-00574-CV, 2017 WL 1244440, at *2 (Tex. App.—San Antonio Apr. 5, 2017, no pet.) (mem. op.) ("In situations involving high-speed chases or emergency[-]response driving by law enforcement [officers], courts employ a particularized need/risk analysis when evaluating good faith. This particularized need/risk analysis was crafted in an attempt to tailor a test that would better weigh the risks that high-speed chases and responses pose to the general public." (internal citations and quotations omitted)); *Green v. Alford*, 274 S.W.3d 5, 15 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("The rapid response required of law enforcement personnel, paramedics, and firefighters is essential for the effective performance of their duties, but the same actions also can pose serious risks to motorists, bystanders, and the responding officials themselves. Consequently, claims arising from an official's high-speed or 'emergency' driving are subject to a particularized need/risk analysis."); *cf. City of San Antonio v. Riojas*, 640 S.W.3d 534, 535 (Tex. 2022) (explaining Texas Supreme Court has "refused to apply" "[the] need-risk balancing analysis . . . outside of the context of a high-speed chase or other emergency law-enforcement response that carries an inherent risk of harm to the public").

41

a high-speed chase or other emergency law-enforcement response that carrie[d] an inherent risk of harm to the public"); *Telthorster*, 92 S.W.3d at 464 (recognizing need/risk analysis from *Chambers* was "crafted in an attempt to tailor a test that would better weigh the risks that high-speed chases and responses pose to the general public" and holding inherent risk to general public previously considered in cases involving high-speed chases was not implicated in cases involving injuries to suspect by law enforcement officer during arrest); *Piedra v. City of Dallas*, No. 05-03-00644-CV, 2004 WL 550792, at *2 (Tex. App.—Dallas Mar. 22, 2004, no pet.) (mem. op.) (holding policy considerations underlying need/risk analysis were not implicated in case and thus particularized need/risk analysis need not be applied). When the situation makes the particularized need/risk analysis unnecessary, the City must satisfy the general requirement of good faith by establishing that a reasonably prudent law enforcement officer, under the same or similar circumstances, could have believed that Officer Gonzales's conduct was justified based on the information she possessed when the conduct occurred. *See Riojas*, 2022 WL 495473, at *3–7; *Telthorster*, 92 S.W.3d at 462–63; *City of Fort Worth v. Robinson*, 300 S.W.3d 892, 898 (Tex. App.—Fort Worth 2009, no pet.); *Padilla v. Mason*, 169 S.W.3d 493, 505–06 (Tex. App.—El Paso 2005, pet. denied); *see also Kelley*, 2010 WL 2650615, at *4–9 (in case involving transportation of inmate to mental health unit, court did not engage in need/risk analysis to determine whether law enforcement officers

42

acted in good faith); *Wheelock*, 2002 WL 112545, at *2 (in case involving transportation of inmates between jails, court did not engage in need/risk analysis when addressing whether law enforcement officer acted in good faith; instead, court analyzed whether reasonably prudent officer could, under same or similar circumstances, have believed conduct was justified); *Rinehart*, 2000 WL 1715902 at *4–5 (same); *Watt*, 949 S.W.2d at 566 (same).

In her deposition, Officer Gonzales testified that on October 2, 2013, around 2:00 a.m., she received a call from security at Ellington Field Airport about the decedent. Airport security reported that the decedent was on airport property and was a "DWI suspect." When Gonzales arrived at the decedent's location, she found the decedent barefoot and "sitting on the curb" next to her car. The decedent was intoxicated and could not stand up on her own. Gonzales had to hold the decedent up so that she would not fall and had to assist the decedent to the patrol car. Gonzales placed the decedent in the patrol car as the decedent was intoxicated and for the decedent's safety because she could not stand up and could get hurt. Gonzales began transporting the decedent to the sobering center in downtown Houston.

The Nicolais' expert witness Dr. Grossberg testified that when Officer Gonzales encountered the decedent, the decedent appeared to be intoxicated and Gonzales had to assist the decedent in standing. According to Dr. Grossberg, Gonzales would not have been able to determine at the time she encountered the

decedent whether the decedent was going to become "more impaired" over time. *See Martinez*, 526 S.W.3d at 568.

Detective Sartor testified that Officer Gonzales had the authority to transport the decedent to the sobering center. And based on the decedent's intoxication level, she was a danger to herself and others. According to Sartor, given what Gonzales "kn[ew] about [the decedent's] condition when [she] first encountered her" on the night of the collision, a reasonably prudent law enforcement officer would not have left the decedent where Gonzales found her on airport property sitting, barefoot, on the curb next to her car because the decedent could have been assaulted and could have gotten into her car and driven off while intoxicated and possibly killed herself or someone else. The decedent "needed to get to a safe place." Additionally, Sartor testified that a reasonably prudent officer could have believed that the need to transport the decedent to the sobering center outweighed any risk of harm to the decedent during transport. *See Martinez*, 526 S.W.3d at 568 ("While good faith may be proved by expert opinion, an officer's sworn testimony may do so too.").

The Nicolais' expert witness Reiter testified that when Ellington Field Airport security first encountered the decedent on the night of the collision, she was "attempting to push her car down the road barefoot." The decedent exhibited signs of intoxication. She was unable to stand up on her own, and "there was an odor of alcohol." If the decedent had been left alone in the dark to push her car in the middle

44

of the night, she would have been vulnerable and would have faced significant risks. According to Reiter, no reasonable law enforcement officer would have left the decedent on the road on airport property. And although there may be more intoxicated drivers on the road around 3:30 a.m., Gonzales had not been told that "there was a drunk driver in the area travelling really fast." *See id.*

Thus, I would conclude that the City met its burden of conclusively establishing that a reasonably prudent law enforcement officer, under the same or similar circumstances, would have believed that Officer Gonzales's conduct in transporting the decedent to the sobering center was justified. *See Riojas*, 2022 WL 495473, at *3–7; *Telthorster*, 92 S.W.3d at 465; *Robinson*, 300 S.W.3d at 899.

Because the City met its summary-judgment burden, to raise a fact issue, the Nicolais had to do more than show that a reasonably prudent law enforcement officer could have reached a different decision. *See Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897. Specifically, the Nicolais had to offer evidence that no reasonable officer in Officer Gonzales's position could have believed that the facts were such that they justified Gonzales's conduct. *Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897.

In response to the City's summary-judgment motion, the Nicolais argued that the City had not conclusively established that Officer Gonzales was acting in good faith at the time of the collision because "no reasonable police officer could have

45

believed that failing to [buckle the] seat belt [of the decedent] was lawful in light of clearly established law and the information possessed by . . . Gonzales at the time." According to the Nicolais, the City "offer[ed] no affidavits or deposition testimony from any" law enforcement officer to show that Gonzales "could have justifiably not seat-belted a handcuffed detainee." (Emphasis omitted.) And the Nicolais provided evidence that Gonzales was negligent in failing to buckle the decedent's seat belt.

The Nicolais' argument is again misplaced. Evidence that a law enforcement officer violated a state law or a law enforcement department policy does not raise a fact issue to rebut a law enforcement officer's good faith nor does recklessness in the performance of the officer's duty belie her good faith. *See Robinson*, 300 S.W.3d at 899–900; *Johnson v. Campbell*, 142 S.W.3d 592, 596 (Tex. App.—Texarkana 2004, pet. denied). Recklessness is negligence, and negligence is immaterial when determining if a law enforcement officer acted in good faith. *Robinson*, 300 S.W.3d at 899; *Johnson*, 142 S.W.3d at 596; *see also Martinez*, 526 S.W.3d at 563 (good-faith inquiry does not concern carelessness or negligence). Even if I was to presume that Officer Gonzales was negligent in failing to buckle the decedent's seat belt before transporting her to the sobering center, this does not defeat her established good faith. *See Telthorster*, 92 S.W.3d at 465; *Martinez*, 526 S.W.3d at 563 ("[O]nly those who are plainly incompetent or knowingly violate the law lack the good faith necessary to be shielded by official immunity."). Based on the

46

foregoing, I would conclude that the Nicolais failed to offer any evidence that no reasonable officer in Gonzales's position could have believed that the facts were such that they justified Gonzales's conduct in transporting the decedent to the sobering center. *Telthorster*, 92 S.W.3d at 465; *Gomez*, 587 S.W.3d at 897.

Because the City conclusively established that Officer Gonzales was performing a discretionary duty in good faith at the time of the collision,[13] I would hold that the trial court erred in denying the City's summary-judgment motion.

I would sustain the City's sole issue.[14]

**Conclusion**

I would reverse the trial court's order denying the City's summary-judgment motion and render judgment dismissing the Nicolai's suit against the City for lack of subject-matter jurisdiction. Because the en banc majority seriously errs in concluding otherwise and because this case does not warrant en banc reconsideration, I respectfully dissent from the granting of en banc reconsideration in this case and the en banc majority's analysis of the merits. *See* TEX. R. APP. P.

---

[13] Again, the parties did not dispute that Officer Gonzales was acting within the scope of her authority at the time of the collision. *See Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002) ("A governmental employee is entitled to official immunity for (1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that the employee acts in good faith."); *Chambers*, 883 S.W.2d at 653.

[14] Due to this disposition, I need not address the City's remaining arguments related to its sole issue. *See* TEX. R. APP. P. 47.1.

47

41.2(c) ("En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration."); *see also In re Marriage of Harrison*, 507 S.W.3d 259, 261 (Tex. App.—Houston [14th Dist.] 2016, order) (Frost, C.J., dissenting to granting of en banc reconsideration) ("[T]he Supreme Court of Texas has made a policy decision to disfavor en banc reconsideration, and instead to reserve the special procedure for rare cases meeting one or both of the two en banc criteria." (internal footnotes omitted)); *Thompson v. State*, 89 S.W.3d 843, 856 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (Jennings, J., concurring in denial of en banc reconsideration) ("The standard for en banc consideration is not whether a majority of the en banc court may disagree with all or a part of a panel opinion. Neither is an assertion that an issue is 'important' sufficient [to justify en banc reconsideration].").

Julie Countiss
Justice

On original submission, panel consisted of Justices Landau and Countiss and former Chief Justice Radack.

En banc reconsideration was requested. *See* TEX. R. APP. P. 49.5.

48

The en banc court consists of Chief Justice Adams and Justices Kelly, Goodman, Landau, Hightower, Countiss, Rivas-Molloy, Guerra, Farris, and Radack.[15]

A majority of the justices of this Court voted in favor of reconsidering the case en banc.

Justice Landau, writing for the majority of the en banc court, joined by Justices Kelly, Goodman, Landau, Hightower, Rivas-Molloy, Guerra, and Farris.

Justice Countiss, dissenting with separate opinion, joined by Chief Justice Adams and Justice Radack.

---

[15]    The Honorable Sherry Radack, Senior Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment. *See* TEX. R. APP. P. 41.2(a).